SONNEBORN SONS, INC., Plaintiff-Appellant, v. FOLLMER, ET, Defendants-Appellees.

Ohio Appeals, Second District, Franklin County.

No. 3933. Decided October 21, 1946.

Eugene F. Morrow, Columbus, W. B. McLeskey, Columbus, for Plaintiff-Appellant.

O. R. Crawfis, Columbus, Luther L. Boger, Columbus, for Defendants-Appellees.

## OPINION

By HORNBECK, P. J.

This is an appeal on questions of law from a judgment of the Common Pleas Court in favor of the defendants. The final entry is a judgment of dismissal, general in form without any separate findings of law or fact. The action was for money, a jury was waived and cause tried to the Court.

The record is voluminous consisting of almost 500 pages together with numerous exhibits and counsel have argued every aspect of the case, both factual and legal, at length, in the fine briefs which are on file and also presented the appeal orally in much detail.

Our province on review is different than that of the trial judge upon the original hearing where he was passing in the first instance upon the credibility of the witnesses and the weight of their testimony as well as upon questions of law which arose as the cause proceeded. We review the case on error and in the absence of special findings of law or fact must indulge every presumption favorable to the judgment below which the record will support. So doing, it is neither necessary, appropriate nor will it be helpful for this Court to indulge in any protracted and nice discussion of the law of bailor and bailee, warehousemen, lessor and lessee and the liability under the law of the parties standing in that relationship to each other, unless the trial court erred in its holdings as to the construction of the written contracts and the admissibility of the oral contract claimed by the defendants to have been made.

The action was instituted to recover the value of 6,267 gallons of oil which plaintiff claimed to have shipped upon consignments to the defendants and which, upon an accounting conformable thereto, appears was missing.

There are two written contracts between the parties, the first dated January 1, 1941, executed a few days thereafter and covering a period from January 1, 1941, to January 1, 1942. The second contract identical in form with the first, dated January 1, 1942, covering a period from that date to January 1, 1943. The business relationship between the parties was concluded on or about July, 1943. During the interim between the date covered by the second contract and the termination of the business relationship between the parties, their rights

were presumptively controlled by the written contracts because it appears that no change in contractual status occurred after the date upon which the second written contract terminated.

For several months prior to the signing of the first contract negotiations had gone on between the parties leading up to the consummated agreement.

It is the claim of the plaintiff that by the terms of the written contracts, the defendants assumed the relationship of bailee of certain packaged oil and also bulk oil which was to be shipped to defendants, the packaged oil to be kept in the warehouse or business building of the defendants and the bulk oil to be stored in tanks, the property of the defendants, and which they had placed for the purpose of carrying out the terms of the contract. The bulk oil was conducted from the tanks by pipe lines into a common line inside the warehouse of defendant company and there controlled and released by valves to customers of plaintiff upon its written order to defendants. The contract set up stipulated payments to be made to the defendant company by the plaintiff for the services to be rendered by it under the contract which, as to the bulk oil, were the preparation of the oil for unloading from storage car to storage tanks, the unloading thereof, the delivery of the oil to the customers of the plaintiff, the use of the storage tanks and such incidental accounting and bookkeeping as was contemplated by the contract.

The requisite proof on behalf of plaintiff and at great length is forthcoming, disclosing the shipments in tank cars of plaintiff to defendant company. The refinery order, the tank car loading order and the bill of lading with the shipment showing the itemized amount of different grades of oil shipped is offered in evidence by exhibits as to each shipment, six in all. In all instances, shipments were receipted for by defendant company according to the itemized statement of plaintiff of the oil shipped. Therein arises the first question at issue between the parties, namely, did the plaintiff ship and did the defendant company receive the amount of oil which is evidenced by the shipment orders and did the receipts of the defendant company bind it to an admission of the receipt of the amount of oil as billed.

The answer to the question whether or not the oil was shipped in the quantities claimed by plaintiff is not dispositive of the judgment below or of this appeal, but it is essential to plaintiff's recovery that it show receipt by defendant company of oil in some amount in excess of that accounted for.

Pursuant to the obligation on the defendant company, it made and sent to plaintiff an inventory of the stock of oil, both packaged and bulk, on hand as of date July 31, 1943. This

showed "total shortage as per book figures 6,267 gallons" the amount which plaintiff claims to be the shortage. On June 30, 1943, an inventory had been returned showing merchandise on hand as of that date, which accounted for gallonage substantially the same as the total shortage shown in the so-called "Book Inventory" of July 31, 1943. Independent of the contract, it would seem logical that the defendant company would not place in its tanks and receipt for any given gallonage unless and until it knew that such receipt covered only the actual gallonage inventoried in the shipment. This view is strengthened by the contention of counsel for the defendant company at the trial that the plaintiff was to provide measuring devices whereby the defendant company could determine the exact amount of bulk oil that it was storing in its tanks. Notwithstanding the contention of counsel, no evidence was forthcoming which even remotely touched this question of measuring devices and, indeed, if it was presented it would tend to strengthen the claim of plaintiff respecting the amount of oil shipped and the necessity of receipt of the exact amount of oil received. In view of the practice of the defendant company in removing the oil from the tank cars and in placing it in its tanks without any semblance of an attempt to accurately determine if it was receiving that which was shown by the shipping orders, it is convincing either, that it was satisfied that under the contract it was not accountable for the gallonage shown by the shipping bills or, at least, that it believed that it was not so accountable. Some color is also given to the claim of plaintiff as to the obligation of the defendant company in receipting for the invoice in the fact, that all of the monthly reports of defendant except the last one only indicated positively that a certain amount of oil was received together with the actual amount of oil on hand. All of this indicia is without effect if the contract speaks as to the nature and extent of the obligation of defendant company in making its receipts and monthly inventories.

The trial judge was of the opinion that the language of the contract was not ambiguous but definite and enjoined upon the defendant the obligation only to acknowledge receipt of the amount of oil shown in the shipping order without any commitment thereby that the shipment was as shown in the order or that the receipt implied that the defendant was actually chargeable with that amount. The pertinent language of the contract is "oil shipped by Daugherty Refinery to itself at Columbus, Ohio, shall be stored in the designated tanks and warehouse space and as each shipment is stored into such tanks and warehouse space, Monarch Petroleum Products shall deliver to Daugherty Refinery warehouse receipts for the quan-

tity of each grade of oil set forth in the notification by Daugherty Refinery to Monarch Petroleum Products covering each shipment." In this paragraph the place where the bulk oil was to be stored was indicated as "the designated tanks" and the place where the packaged oil was to be stored was designated as "warehouse space." The obligation to receipt is for the "quantity of each grade of oil set forth in the notification * * * covering each shipment." As heretofore stated, the trial judge was of opinion that there was no ambiguity in this provision of the contract and that the obligation of the defendant company was to receipt to plaintiff as to the oil shipped to itself for the amount which it stated was contained in the shipment. We are in accord with this construction.

Manifestly, if the defendant was to be held responsible to account for the actual gallonage appearing in the invoice, some provision would have been made, first, to make that obligation definite and, second to set up some method whereby the defendant could take advantage of and be credited with any actual shortage occurring by reason of the fact that it did not receive the full amount set forth in the shipment invoice.

This provision alone, however, did not absolve the defendant company from accountability, under the terms of its contract, for all oil actually received by it.

The trial judge did not determine the actual gallonage shipped to and receipted for by the defendant but the plaintiff in the most meticulous manner traced every step incident to the loading and shipment of the oil and the precautions and safety measures that were taken to insure its transmittal to its destination. There is no disproof of the claim of the plaintiff as to the amount of oil shipped and there is nothing but conjecture as to any loss of oil in transit. If the determination of this issue was dispositive of the rights of the parties, we would be required to say, under the evidence, that the oil was shipped by the plaintiff in the amounts as shown by its invoices and further that, in probability, it reached the consignee in the amounts designated.

The next step in the consideration of this case is the effect of the written contract to establish the obligation of the defendant company to account for the oil received either as lessor, bailee or as warehouseman. If the relationship of the parties is that of bailor and bailee, without qualification, then, upon the showing of the receipt of the oil by the bailee, as such, prima facie proof is thereby made which requires the defendant to go forward and to explain any shortage that eventually occurred, and if unable to do so to account therefor. This Court has so held in **North River Insurance Co. v Ohmer,**

etc., 63 Oh Ap 346, 17 OO 97, 26 N.. E. (2d) 767, as has the Supreme Court, more recently, in **Agricultural Ins. Co. v Constantine, etc., 144 Oh St 275.**

If the applicable part of the written contract on the subject now under consideration requires the construction claimed by plaintiff, then, without respect to other aspects of the contract which might indicate another relationship than bailor and bailee, the defendant would be liable because of that provision. The language is "Upon and after having undertaken to store said oil in said leased tanks and warehouse space, Monarch Petroleum Products agrees to be responsible for **the maintenance in good condition of the said oil in such tanks** and warehouse space until such time as it has been delivered to the buyer or buyers of same. If the tanks or warehouse facilities are damaged, or if a permit is refused, or the tanks or warehouse become untenantable for any cause whatever, this agreement shall be forthwith terminated, * * * ." It is insisted that the language emphasized bound the defendant company to maintain in the storage tanks the full amount of oil placed therein subject only to that which was taken therefrom upon the written order of the plaintiffs. That is to say, that the maintenance applied both to the amount and the condition of the oil. It is susceptible of such construction. It is the claim of the defendant that this language does not require nor permit the construction urged by the plaintiff and that it only referred to the condition of the oil in the tanks and enjoined upon the defendant company an obligation respecting the condition of the oil only and not to the maintenance of any quantity thereof in the tanks. The trial judge adopted the view that it, at least, was ambiguous. We are of like opinion.

The defendants then offered the testimony of Mr. Follmer, President of defendant company, who was corroborated in material instances, to. the effect that prior to .the execution of the first contract in discussing the proposed business arrangement between the parties and the erection of the tanks the attention of the agents of the plaintiff, Mr. Spitlar and Mr. Felton, was called to the general location of the tanks to be erected and that it was pointed out by Mr. Follmer that it was "on top of the levee or bank of the Scioto River (not on the property of defendant company), and that I would not be responsible in any way, shape or form for anything placed on this river bank," I says, "river rats, they go up and down there, the corner of the buildings, and box cars, or any place, fishermen sitting down there all the time, I wouldn't be responsible for anything if we would put these tanks out here on this river bank, you would have to assume all and every respon-

sibility regarding them because anybody could come along with a wrench, unscrew a connection, they could take a hamher and knock a pipe off, it would all run into the river, we would have no recourse for collecting damages or anything else, so if you want to store oil out there I will lease you the tanks and you assume your own responsibility, get your own insurance if you want protection, and pay your own taxes on the product." This conversation is denied by Mr. Spitlar and Mr. Felton of the plaintiff company with whom it was claimed to have occurred. The contract did make provision that plaintiff would carry insurance on the stored bulk oil but was not specific, whether it should be theft or fire, but subsequent to the date of the contract it was made the subject of correspondence and defendant was informed that plaintiff could not carry theft insurance because the tanks were not on its own property. This lends some support to the contention that theft insurance was in contemplation of the parties by the language used in the contract and that it was to be carried by the plaintiff on its own personal property, viz.: the bulk oil.

If the oral contract and understanding between the parties was in accord with the testimony of Mr. Follmer and other witnesses for the defendants then, clearly, the defendants were absolved from any liability for the unexplained shortage in the gallonage which occurred.

The facts in this case might well be described as presenting the mystery of the missing oil. There are three reasons, either one or more of which, will explain the shortage. First, that the defendant company did not receive the amount of oil invoiced to it in the shipments. We have heretofore discussed this question. Second, the defendant company through its employees either drew from or permitted the oil to be drawn from the valves within its exclusive control in its warehouse. Third, leakage of oil from the tanks or its theft therefrom. This record is entirely devoid of any evidence of probative effect that the oil was taken from or escaped from the tanks. There is no suggestion of any interference with any of the pipes or connections thereto although careful inspection was made by both parties. There was nothing, prior to the report of the so-called theft to the Police Department, nor did anything appear thereafter and prior to the trial, to direct suspicion to any person as a thief of the oil or any method or manner which may have been employed to steal it. It is significant and most unusual that when the shortage was discovered, it was found that every drop of every grade of oil was missing. This could not, in any probability, have resulted from the withdrawal made necessary by the regular delivery orders from the plaintiff to the defendant company.

The rights of the parties rest largely upon the question upon whom is the burden of proof, or more exactly the obligation of going forward with proof. If upon showing of the shortage, it was incumbent upon the defendants to show the reason therefor, then the defendants have not met that obligation. On the other hand, if the obligation was upon the plaintiff not only to show the shortage but to show the reason and that defendants were responsible therefor, it has failed.

Upon the proper construction of the written contracts and the effect of the oral contract explanatory thereof, the plaintiff has not met its burden because the defendant company would only be held responsible if, and when, it appeared that it was the agent through which the shortage occurred. There is no such proof in this record. Ascribing to the defendant company the presumption of honesty and faithfulness of performance of its obligations, it appears that it has accounted for all of the oil which was withdrawn under the terms of its contract. To hold it for any other or further obligation would be to conjecture that, either it dishonestly withdrew the oil which conclusion may not be indulged on the record, or that it is responsible for leakage or theft from the tanks along the river bank, an obligation from which by the express terms of the oral contract, it was absolved.

We could well have rested our judgment upon the opinion of Judge King which shows a fine grasp of the facts and, in our judgment, a proper interpretation of the law controlling. However, because counsel have spent so much time and presented this case with such care, we have felt an obligation to discuss it at considerable length even though much that we have said is but a duplication of that which has heretofore been stated by Judge King.

The judgment will be affirmed.

WISEMAN and MILLER, JJ, concur.